## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

DR. BRYAN SMITH, individually and derivatively
on behalf of PEARL RIVER CAPITAL, LLC,

       Plaintiff,

v.

BRADEN JANOWSKI, and FIELDVIEW
CAPITAL MANGEMENT, LLC,

       Defendants.

### COMPLAINT

Plaintiff, DR. BRYAN SMITH, individually and derivatively on behalf of PEARL RIVER

CAPITAL, LLC, by and through his attorneys, R TAMARA DE SILVA and JONATHAN LUBIN,

hereby Complain of BRADEN JANOWSKI and FIELDVIEW CAPITAL MANAGEMENT,

LLC, stating:

### Introduction, Jurisdiction and Venue

1.    This is a civil action brought under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836,

et seq., and under the common law of Delaware and Michigan. It seeks redress for the unlawful

acts of Defendant Braden Janowski, who, after co-founding Pearl River Capital, LLC ("PRC") with

Plaintiff Dr. Bryan Smith, misappropriated PRC's most valuable intellectual property—a

proprietary trading system and related algorithms developed by Dr. Smith—and diverted it to a

new entity, Fieldview Capital Management, LLC. Fieldview now serves the same client base and

employs many of PRC's former personnel, but entirely excludes Dr. Smith, thereby depriving him

of his rightful ownership interest and the benefits of the trade secrets he created.

2.   Dr. Bryan Smith resides in the Western District of Michigan.

3.   Pearl River Capital, LLC is a Delaware corporation headquartered in the Western District of Michigan.

4.   Fieldview Capital Management LLC is a Michigan corporation headquartered in the Western District of Michigan.

5.   E5 Holdings, Inc. is a Michigan corporation.

6.   Braden Janowski resides in the Western District of Michigan.

7.   This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks damages under federal statute and the United States Constitution.

8.   This Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367 because the state-law claims are integrally related to the federal claims.

9.   Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the relevant events took place in the Western District of Michigan.

## Facts Common to All Counts

10.   Dr. Bryan Smith was trained as a physicist at the Massachusetts Institute of Technology (MIT.), earning a PhD in Physics in 1998.   Over decades, Dr. Smith mastered advanced programming and data science skills, which he deployed to create innovative and highly valuable trading systems.

11.   He has spent time researching in some of the top laboratories in the world, including Fermilab, IL, and the European Council for Nuclear Research ("CERN").

12.   Dr. Smith was part of a Nobel Prize winning team at MIT in 1998 and the recipient in 1993 of the Orloff Prize for research at MIT.

13. Dr. Smith also is an expert computer programmer, with proficiency in C++, C, Java, Python, R, Matlab, Julia, Mathematica, C#, VB, SQL, PostgreSQL, Oracle, kdb, Linux, Windows, Git, Fortran, Scheme, Assembler, FPGA, NN, NLP, ML, AI, PyTorch, TensorFlow, AWS, Azure, Google Cloud, Quantum Computing, CPU, GPU, unit testing, integration testing, algorithms, data structures, and design patterns.

14. From April 1, 2001, he has focused on quantitative analysis in the financial sector.

15. From 2001 to 2016, Dr. Smith held senior quantitative roles at UBS O'Connor, Alternative & Quantitative Investments in Chicago, serving as a chief scientist for a $2 billion quantamental portfolio. He developed and implemented cutting-edge alpha generation techniques, signal factor research, forecasting models, portfolio construction algorithms, and risk frameworks, making significant and unpublished contributions. During this period, he also wrote comprehensive backtesting code, created sophisticated portfolio monitoring and screening tools, managed source code control systems, and established a corporate master database and data warehouse.

16. As a Senior Quantitative Strategist, Dr. Smith supported a global, quantitative, market-neutral equity long-short portfolio with $3 billion in gross exposure. He integrated proprietary volatility models into high-frequency options trading, developed a quantitative credit model that performed well during the credit crisis, and built IT infrastructures supporting systematic capital structure arbitrage. Additionally, he devised intra-day strategies leveraging ETF-stock interplay using tick data, conducted execution analyses to optimize trading algorithms, and ensured business continuity planning for all quantitative operations.

17. While at UBS, in 2012, Dr. Smith met Braden Janowski. Braden Janowski was co-managing a strategy called Quantamental and recruited Dr. Smith to work for him. Dr. Smith designed and implemented the entire Quantamental infrastructure.

18. Although Janowski was nominally in charge of billions in analyst tracking portfolios at UBS O'Connor under the guise of "Quantamental," the real intellectual engine behind these strategies stemmed from Dr. Smith's work. It was Dr. Smith's aggregate quant multifactor model and REITs models, not Janowski's own innovations, that formed the basis of the investment strategies Janowski later marketed to other sophisticated investors.

19. In 2016, Dr. Smith and Janowski left UBS and decided to open their own firm, Pearl River Capital, LLC ("PRC").

20. Dr. Smith exclusively designed PRC's proprietary trading system, including advanced algorithms, backtesting frameworks, and data infrastructure, all of which gave PRC a decisive competitive edge.  Dr Smith allowed Janowski to market them but never dreamed Janowski's goal was to pretend they were his own.

21. Janowski marketed Dr. Smith's $1.3 billion in Assets Under Management (AUM) aggregate quant multifactor model and REITs models to the Schonfeld Group, also known as Schonfeld Strategic Advisors, LLC ("Schonfeld"), which would become PRC's sole client.

22. Schonfeld is an American hedge fund located in New York City. It focuses on algorithmic trading. In 2016, Schonfeld was in the process of building out their platform to entice quantitative portfolio managers to join them.

23. This made PRC a perfect fit for its sole client, given Schonfeld's focus on algorithmic trading. Dr. Smith drew on his deep quantitative finance experience and programming expertise to develop a proprietary quantitative trading framework, including systems, processes, algorithms, and configurations specifically for PRC. These proprietary trading tools and intellectual property were then used in executing trades on Schonfeld's behalf.

24. In 2016, when PRC was seeking to engage Schonfeld as its sole client, Schonfeld executives remained uncertain about moving forward. To demonstrate the rigor and potential of PRC's

4

strategies, Dr. Smith traveled to Schonfeld's Manhattan offices for a critical meeting attended by senior members of the firm, including Steve Schonfeld, Andrew Fishman, Ryan Tolkin, Alex Burns, and two administrative staff members taking notes, as well as Janowski. During this meeting, Dr. Smith led a detailed presentation on the whiteboard, deriving formulas, explaining the underlying models, and illustrating how the strategy would generate returns. His technical expertise, clarity of explanation, and established track record convinced Schonfeld of PRC's value. As a direct result of Dr. Smith's presentation and insights, Schonfeld executed an agreement to become PRC's primary client.

25. The two members of PRC are Dr. Bryan Smith, with a 40% membership interest, and Braden Janowski, with a 60% membership interest.  Dr. Smith only agreed to a 40% membership interest because Janowski represented that all decisions would be made on a 50/50 basis.  Dr. Smith made the fatal mistake of taking him at his word.

26. From the start, both members were also employees of PRC.

27. Under Dr. Smith's leadership as Head of Quantitative Research, PRC grew to manage over $1.6 billion in assets. Its performance and reputation were directly attributable to Dr. Smith's intellectual property ("IP"), expertise, and rigorous research methodologies.

28. Dr Smith also assumed many other responsibilities at PRC which are traditionally subscribed to a CTO, COO, or CIO at a quantitative hedge fund.

29. As a 40% owner of PRC, Dr. Smith would ordinarily be entitled to 40% of the performance fees generated by PRC's investment activities with its sole client. Because PRC typically earned a 22.5% performance fee on the fund's profits -rising to 32.5% if certain Sharpe ratio targets were met,  Dr. Smith's interest effectively entitled him to between approximately 9% and 13% of the fund's net performance. This arrangement promised substantial earnings directly tied to the intellectual property and quantitative strategies he developed.

30.  Despite this clear financial stake and the expectation of significant income from PRC's successful performance, Dr. Smith was never provided an accounting, brokerage statements, or documentation to explain why his share of the profits in 2023 and 2024 was zero.

31.  From approximately 2017 onward, Dr. Smith consistently warned Janowski against using his position as Chief Investment Officer and Chief Compliance Officer to engage in personal trading that Dr. Smith viewed as unethical front-running or trading ahead. Despite these warnings, Janowski disregarded Dr. Smith's concerns and the unchecked conflict of interest that Janowski had created.

32.  Perhaps because of Dr. Smith's consistent pressure regarding the appearance of impropriety, and the importance of maintaining the strictest standard of ethics, Janowski orchestrated the termination of Dr. Smith in 2023.

33.  On June 1, 2023, while Dr. Smith was abroad tending to a sick family member, Janowski terminated Dr. Smith's operational role. Janowski waited until Dr. Smith was out of the country, visiting a sick family member, before formally terminating him. Though stripped of day-to-day duties, Dr. Smith retained his 40% ownership interest and the corresponding legal rights to access PRC's financial and operational records and to receive distributions for tax liabilities.

34.  Shortly after Dr. Smith was terminated on June 1, 2023, he received a "nice" termination letter. However, within hours of sending that letter, Janowski personally called Dr. Smith and issued a series of explicit verbal threats aimed at coercing Dr. Smith into accepting Janowski's unilateral terms. These threats underscored Janowski's intent to seize credit for Dr. Smith's intellectual property and prevent Dr. Smith from benefiting from the substantial value he created.

35.  Specifically, Janowski threatened that if Dr. Smith did not capitulate and accept his buyout demands, Dr. Smith would: (1) never see another ownership dividend; (2) never work in the field again (though Janowski claimed he could "get Dr. Smith a job" if he agreed); (3) witness PRC being reconstituted in one year with a "cosmetic code rewrite" to evade Dr. Smith's IP rights; (4) have the

value of his shares driven down to zero; (5) be "bled dry" with legal fees; (6) face financial "attack"

by Schonfeld's deep pockets; (7) be crushed by tax liabilities; and (8) be forced to accept a

"liquidation value" for his stake under the guise that PRC was worthless.

36. These threats, made immediately after Dr. Smith's termination, reveal Janowski's

premeditated plan to strip Dr. Smith of both credit for his groundbreaking IP and any rightful

financial gain it should have generated. By threatening professional, financial, and reputational harm,

Janowski attempted to deter Dr. Smith from defending his legal rights, thereby ensuring that

Janowski could misappropriate Dr. Smith's intellectual property without meaningful opposition.

37. Immediately following Dr. Smith's termination, PRC, under Janowski's sole control, refused

all requests by Dr. Smith for financial statements, tax returns, valuations, and the Investment

Management Agreement ("IMA"). This denial of records persisted for over a year and a half, despite

Delaware law and PRC's Operating Agreement entitling Dr. Smith to such information.

38. Janowski prevented Dr. Smith from accessing the premises altogether, and locked him out

of PRC's computers. This prevented Dr. Smith from seeing what would come next.

39. Between June and September 2023, Janowski secretly initiated a reorganization of PRC

without holding a shareholder vote or providing notice to Dr. Smith. Janowski pursued negotiations

with third parties, including Schonfeld and Quantbot, but offered no updates to Dr. Smith regarding

the impact on PRC's assets or Dr. Smith's ownership interest.

40. Janowski and those acting on his behalf, ignored Dr. Smith's requests to preserve documents

and failed to produce critical materials. At the advice of counsel, Dr. Smith had written to

Janowski's law firm and asked that he be allowed to remove his files accompanied by his lawyers.

This was not allowed to happen. When certain documents were eventually provided, they

conspicuously excluded Dr. Smith's personal notebook and the IMA that governed PRC's main

client relationship, further obstructing Dr. Smith's understanding of PRC's financial condition.

41. On September 21, 2023, Dr. Smith estimated his stake to be worth between $2.6 million and $16.25 million.

42. In 2023 Janowski made verbal statements suggesting he would make minor modifications to Dr. Smith's proprietary code and effectively "steal" it, further indicating a deliberate effort to deprive Dr. Smith of the substantial income stream derived from the IP he created.

43. As 2024 progressed, Dr. Smith's counsel requested a proper accounting and requested that Janowski comply with PRC's Operating Agreement, including Section 5.2's requirement for distributions to cover tax liabilities. Instead of providing transparency, Janowski transferred PRC's assets, employees, and IP into new entities under his control such as PRC Holdings, Inc., E5 Holdings, Inc., and ultimately Fieldview Capital Management, LLC ("FCM").

44. In May 2024, Janowski represented himself as the 100% owner of PRC Holdings to open new accounts at financial institutions, effectively transferring PRC's assets away from Dr. Smith's reach into other holding companies, including E5 Holdings, Inc. This restructuring occurred even before FCM was formally created in June 2024. Dr. Smith received no notice or explanation, further concealing the firm's true financial state and the disposition of its resources.

45. By mid-2024, Janowski's actions ensured that PRC's prime brokerage accounts, once tied to substantial AUM, had been closed, replaced, or re-labeled, making it impossible for Dr. Smith to ascertain what happened to PRC's previously robust asset base. Janowski's conflicting statements about PRC's revenues and AUM, sometimes changing valuation claims within days, signaled deliberate attempts to obscure the firm's worth and mislead Dr. Smith.

46. Without accurate records, Dr. Smith cannot properly determine his tax obligations. Janowski's refusal to provide truthful financial data leaves Dr. Smith vulnerable to under-reporting his tax liabilities and becoming entangled in potential tax fraud. Janowski frequently boasted about

"never paying taxes," and Dr. Smith, who wants no part in such schemes, was denied the distributions and documentation required under the Operating Agreement.

47. Janowski's secretive and deceitful conduct extended to federal regulatory filings. On information and belief, Janowski submitted false or misleading Form 13Fs to the SEC on behalf of PRC, halving reported AUM and obscuring the reorganization's nature.  Dr. Smith, kept in the dark, suspects these filings were intended to reduce the performance-based fees owed to him and potentially lower tax liabilities by understating the firm's true financial condition.

48. After terminating Dr. Smith, Janowski opened a competing firm, Fieldview Capital Management, LLC ("Fieldview," "FCM") sometime around June 2024 with most all the same people that PRC had.

49. Upon information and belief, the same proprietary framework, systems, applications, processes, algorithms, and configurations that FCM uses is the same that PRC used.

50. In October 2024, Janowski dissolved PRC without notifying Dr. Smith or providing any legitimate accounting for the disappearance of its core assets, including Dr. Smith's IP. This dissolution occurred after PRC's critical resources had been transferred to FCM, effectively a successor entity performing the same functions, for the same client, using the same technology, but without Dr. Smith's involvement or compensation.

51. Following PRC's dissolution, Janowski's counsel indicated in October 2024 that approximately $300,000 remained in PRC but without substantiation. Even then, they refused to acknowledge Dr. Smith's 40% ownership or provide him with any share. Instead, they stated that if Dr. Smith pursued legal action, all the remaining funds would be used by Janowski to defend against him, further demonstrating Janowski's intent to deprive Dr. Smith of his rightful property.

52. On October 3, 2024, counsel for Janowski admitted that Janowski was moving all intellectual property of PRC to PRC Holdings, LLC, which is entirely owned and controlled by Janowski.

53. Contrary to Janowski's claims that PRC was "worthless" at the time of Dr. Smith's termination, objective analysis shows the exact opposite. PRC managed approximately $1.6 billion in AUM, and even a conservative estimate of fund performance and fee structures indicates that Dr. Smith's 40% interest was worth millions of dollars. Using a Sharpe ratio of 2 and a fund volatility of 1.5%, the fund's expected return would be approximately 3% annually. With PRC's known performance fee arrangements, Dr. Smith's stake would have yielded a substantial, long-term revenue stream.

54. For example, assuming a 20% to 22.5% performance fee and Dr. Smith's 40% share of those profits, a multi-year projection of PRC's expected returns, based on industry-standard longevity assumptions for a hedge fund, generates valuations of Dr. Smith's ownership interest well into the tens of millions of dollars. Even under more pessimistic assumptions involving fund default probabilities and reduced Sharpe ratios, his stake would still command several million dollars, not the nominal amount Janowski offered as a buyout.

55. This massive discrepancy between Dr. Smith's rightful financial expectations and Janowski's claims of worthlessness reveals Janowski's clear motive for misappropriating Dr. Smith's intellectual property. By denying Dr. Smith access to financial records, withholding distributions, and dismantling PRC to form Fieldview Capital Management, LLC without his involvement, Janowski not only prevented Dr. Smith from realizing the substantial value of his ownership interest, but also ensured that Janowski could benefit exclusively from the proprietary trading systems and strategies that Dr. Smith created.

56. In short, Janowski's narrative that PRC had no value on the heels of a thriving $1.6 billion fund was a transparent pretext to justify dislodging Dr. Smith, stealing his IP, and pocketing the profits himself. This sequence of events underscores the central motive behind Janowski's actions:

to secure for himself the wealth and advantage that Dr. Smith's innovative work and intellectual capital had generated.

57. Janowski took steps to sabotage Dr. Smith's professional future. After Dr. Smith sought new employment opportunities—given that PRC no longer existed, Janowski actively disparaged him to prospective employers, effectively carrying out his earlier threats to prevent Dr. Smith from working elsewhere if he dared to challenge Janowski's control and "squash him like a bug," and that "you will never work anywhere again."

58. On information and belief, FCM is a competing firm because it does the same thing as PRC for the same client with exactly the same people and the same IP. In effect, Janowski moved all of PRC's business to FCM.

59. On information and belief, most of the employees from PRC have been moved to FCM.

60. On information and belief, the IP that FCM uses is the same IP that PRC used.

61. That the IP was developed by Dr. Smith, and is the property of Dr. Smith.

62. Alternatively, even if the IP is not the property of Dr. Smith, it is still the property of PRC. Its use by FCM and E5 Holdings and other entities, constitutes a violation of the Defend Trade Secrets Act not only in the sense that it is being used to compete with PRC but also in the sense that its use by FCM has essentially put PRC out of business.

63. In order to accomplish this seamless transition, Janowski would have had to have taken affirmative steps to transfer business from PRC to FCM and/or other entities and holding companies, while working at PRC.

64. Indeed, Janowski is still functioning as the sole manager of PRC.

65. Janowski has severely depleted the assets of PRC.

66. The depletion of the assets is inexplicable, a breach of fiduciary duty. Prior to Dr. Smith's termination, PRC was an extremely successful company, with many employees.

67. Based upon the apparent breach of fiduciary duty, including the transfer of PRC's business and the theft and transfer of intellectual property to FCM, Plaintiff has asked for a full accounting.

68. Despite Dr. Smith's repeated requests for an accounting, including a formal request as recently as November 2024, Janowski and his counsel have largely refused to provide substantiated financial information. Instead, they have responded with baseless personal attacks and unfounded, often defamatory allegations against Dr. Smith - conduct clearly intended to intimidate him and divert attention from the underlying failure to produce the records to which he is legally entitled.

69. On December 10, 2024, counsel for Janowski and PRC went so far as to fabricate the assertion that Dr. Smith had "converted" PRC property by retaining certain twenty-five-year-old research documents originating from Dr. Smith's prior employment at UBS O'Connor- to divert attention away from their client. This accusation was made in bad faith and consistent with Janowski's pattern of bullying and discrediting Dr. Smith. The documents at issue relate to research results published publicly by 2004, pertain to a strategy that was shut down decades ago, and were fully declassified by UBS O'Connor by 2011.

70. In approximately 2014, when UBS O'Connor downsized its office space, it expressly permitted Dr. Smith to retain these legacy materials as keepsakes. At that time, UBS O'Connor had no further proprietary or confidential interest in these documents. If Janowski or PRC genuinely believed the materials constituted "improperly retained" intellectual property, they would have promptly notified UBS O'Connor or taken action earlier, rather than remaining silent until Dr. Smith sought an accounting of PRC's assets and IP.

71. Notably, these allegations, like the *ad hominem* attacks and attempts to discredit Dr. Smith, surfaced only after Dr. Smith demanded transparency and a proper accounting from PRC. Prior to Dr. Smith's requests for corporate records and fair valuation, Janowski and PRC never questioned

his possession of these documents. Nor did they report any purported impropriety to UBS O'Connor or return Dr. Smith's personal notebooks, which Dr. Smith had requested.

72.  The timing and nature of this "conversion" claim strongly suggest that it is a retaliatory and pretextual tactic designed to distract from Janowski's own misappropriation of PRC's intellectual property and to deter Dr. Smith from asserting his legitimate rights. By attempting to portray Dr. Smith as engaged in wrongdoing based on decades-old, publicly disclosed, and declassified materials that UBS O'Connor expressly allowed him to keep, PRC and Janowski seek to undermine Dr. Smith's credibility and dissuade him from pursuing rightful claims to his ownership interest, performance-based profits, and the valuable IP he developed.  Janowski had millions of dollars in motives to get rid of Dr. Smith.

73.  Janowski's actions represent a sustained campaign to strip Dr. Smith of his rightful 40% ownership interest in PRC, misappropriate and steal valuable trade secrets and intellectual property, manipulate financial records and corporate structures to avoid scrutiny, and ultimately divert PRC's profitable business into FCM. In doing so, Janowski not only withheld an accounting of PRC's profits and performance fees owed to Dr. Smith but also enlisted or enabled others -knowingly or unknowingly- to become indirectly complicit in the theft of Dr. Smith's IP. As a result, Dr. Smith has been deprived of financial transparency, fair valuation of his interests, and proper distributions from PRC's profits, and has suffered reputational harm due to Janowski's defamatory conduct.

## Count I – Defend Trade Secrets Act of 2016

### Brought by Plaintiff in his individual and derivative capacity against both Defendants

74.  Dr. Smith and PRC generally protected the algorithms, proprietary framework, systems, applications, processes, and configurations because they were Dr. Smith/PRC's valuable intellectual property.

13

75.  . Of course, all of the protection from the outside will not stop the ultimate insider, Janowski, from misappropriating the intellectual property, transferring it to a new company, and falsely representing it as his own.

76.  Taking the intellectual property with him of something he did not build or own constitutes a misappropriation and theft of PRC or Dr. Smith's trade secret.

WHEREFORE, Plaintiffs request that this Honorable Court enter an Order finding that Janowski and FCM violated the Defend Trade Secrets Act, and Award Plaintiff an injunction to protect the intellectual property, and prohibiting FCM or Janowski from using it any way other than through PRC, damages, including interest, costs and reasonable attorneys' fees.

### Count II – Accounting

### Brought by Plaintiff derivatively on behalf of PRC against Janowski.

### (Pursuant to the Common Law of Delaware)

77.  Plaintiff has been locked out of PRC altogether and therefore has no access to any of its information including financial information.

78. Plaintiff has requested an accounting to no avail.

WHEREFORE, Plaintiff requests that this Honorable Court Order a full accounting of PRC and enter an order awarding PRC whatever damages are owed to it due to any breach of a fiduciary duty on the part of Janowski, including costs and interest.

### III – Breach of a Fiduciary Duty

### Brought by Plaintiff derivatively on behalf of PRC against All Defendants

### (Pursuant to the Common Law of Delaware)

79.  These actions, which included forming a new company to the detriment of PRC that directly competed with PRC (and essentially replaced PRC), using PRC's business model, intellectual property, and employees, constituted a breach of Janowski's fiduciary duty to PRC.

80.  FCM is the direct beneficiary of this breach.

### Count IV – Defamation

### Brought by Plaintiff individually against Janowski

### (Pursuant to the Common Law of Michigan)

81.  After being terminated from PRC, Plaintiff has attempted to find alternative employment. He applied for a position with a financial institution.

82.  The potential employer initially expressed interest, but then withdrew all interest after speaking with Janowski.

83.  Janowski defamed Plaintiff to this potential employer by stating untrue and disparaging things about Plaintiff's character, ethics, and professional credibility. These statements were made with malice and for the purpose of harming Plaintiff.

84.  Janowski has similarly defamed Plaintiff throughout the financial industry, making it difficult for Plaintiff to secure alternative employment.

## Count V – Breach of the Operating Agreement

## Brought by Plaintiff derivatively on behalf of PRC against Janowski

85.   At all relevant times, PRC operated pursuant to a valid and enforceable Operating Agreement governing the rights and obligations of its members.

86.  Pursuant to Section 5.2 and other provisions, PRC was required to provide distributions to cover tax liabilities and grant members access to financial and operational records.

87.  Janowski's refusal to provide these documents and distributions, along with his transfer of PRC's assets and opportunities to Fieldview Capital Management, LLC without approval, constitutes a material breach of the Operating Agreement.

## Count VI – Unjust Enrichment

## Brought by Plaintiff individually and derivatively on behalf of PRC against All Defendants

87. By misappropriating PRC's business, intellectual property including proprietary framework, systems, applications, processes, algorithms, and configurations and assets, Defendants obtained substantial economic benefits at the expense of PRC and Dr. Smith.

88. Defendants retained these benefits under circumstances making their retention unjust, as Dr. Smith contributed substantial time, expertise, and proprietary technology.

89. Equity and good conscience require that Defendants disgorge these benefits and compensate PRC and Dr. Smith.

**Count VII – Conversion**

**Brought by Plaintiff individually and derivatively on behalf of PRC against All Defendants**

90. PRC's proprietary IP including proprietary framework, systems, applications, processes, algorithms, and configurations, client relationships, and associated data are valuable property interests belonging to PRC and/or Dr. Smith.

91. Defendants wrongfully exerted dominion and control over this property by using it at Fieldview without authorization, effectively denying Dr. Smith and PRC the benefits of their rightful ownership.

**Count VIII – Fraud/Fraudulent Concealment**

**Brought by Plaintiff individually and derivatively on behalf of PRC against Janowski**

92. Janowski knowingly made false statements and concealed material information regarding PRC's financial condition, the value of its assets, and its ongoing client relationships.

93. These misrepresentations and omissions were intended to induce Dr. Smith to forego asserting his rights, accept a grossly undervalued buyout, or otherwise fail to challenge Janowski's actions.

94. Dr. Smith justifiably relied on Janowski's assertions to his detriment, causing him financial harm.

WHEREFORE, Plaintiff Dr. Bryan Smith, individually and derivatively on behalf of Pearl River Capital, LLC, respectfully requests that this Honorable Court:

A. Enter judgment in Plaintiff's favor on all Counts herein;

B. Declare that Defendants have violated the Defend Trade Secrets Act and other applicable

federal and state laws as alleged;

     C. Award Plaintiff and PRC compensatory damages, including but not limited to lost profits,

lost earnings, and the value of misappropriated intellectual property;

     D. Award Plaintiff damages for emotional distress and reputational harm;

     E. Award punitive or exemplary damages where permitted by law, including for Defendants'

willful and malicious misconduct;

     F. Grant injunctive relief enjoining Defendants from further use, disclosure, or

misappropriation of the trade secrets and intellectual property at issue;

     G. Order a full accounting of PRC's assets and financial records, and direct the

disgorgement of any ill-gotten gains;

     H. Award Plaintiff his reasonable attorneys' fees, costs, and interest as allowed by law; and

     I. Grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,


/s/ R Tamara de Silva
R Tamara de Silva
DeSilva Law Offices, LLC
110 North Wacker Drive, Suite 2500
Chicago, IL 60606
Tel: (312) 810-8100
Email: tamara@desilvalawoffices.com

/s/ Jonathan Lubin
Jonathan Lubin
(pending admission *pro hac vice*)
8800 Bronx Ave., Suite 100H
Skokie, IL 60077
Tel: (773) 954-2608
Email:jonathan@lubinlegal.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/R Tamara de Silva</u>